UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 25 Cr. ___ |
| JAY LUCAS, | |
| Defendant. | **25 CRIM 581** |

## COUNT ONE
**(Securities Fraud)**

The Grand Jury charges:

1.     Since at least in or about 2017, JAY LUCAS, the defendant, has schemed to induce investors to entrust him with millions of dollars by falsely representing that their money would be placed in private funds investing in early-stage health and wellness companies. But instead of managing investor money as promised, LUCAS treated the private funds he managed as "cookie jars," and systematically diverted investors' money to cover personal expenses, promote unrelated ventures, and make Ponzi-like payments to earlier investors. LUCAS also purposefully misled investors regarding the operations of his private funds, the nature and value of the funds' investments, and the fees and costs charged to investors.

2.     As the founder and managing partner of Lucas Brand Equities, LLC ("LBE"), JAY LUCAS, the defendant, raised over $50 million from investors across three private funds: Lucas Brand Equity LP ("Fund One"), L.B. Equity Emerging Growth LP ("Fund Two"), and L.B. Equity Wellness Growth L.P. ("Fund Three," and together with Funds One and Two, "The Funds"). LBE served as the managing member of each of the Funds, and LUCAS and LBE acted as investment advisors. As an investment advisor, LUCAS was a fiduciary for his clients, and he was dutybound to act in their interest with the utmost good faith and candor.

3.      In marketing the Funds to investors, JAY LUCAS, the defendant, fabricated and exaggerated his professional credentials and misrepresented how he intended to use invested money. As to his experience, LUCAS claimed to have co-founded a well-known private equity firm, which he did not, eventually prompting lawyers from that firm to issue a cease-and-desist demand to LUCAS. As to his investment strategy, LUCAS told investors that LBE's "core strategy is to invest in these small to mid-size emerging brands, provide value added services to differentiate them and catalyze growth to a sufficient scale for exit." In reality, and as he intended at the time he so stated, LUCAS repeatedly spent the investors' money on expenses entirely unrelated to the Funds and their portfolio companies, including on alimony payments, rent for personal property, vanity projects like a local New Hampshire newspaper in his hometown, and political consultants.

4.      In running LBE and managing the Funds, JAY LUCAS, the defendant, routinely breached his fiduciary duties to his clients by placing his own economic interests above those of his investors and the Funds by concealing self-dealing conduct and conflicts of interest. LUCAS spent investor money on expenses unrelated to the Funds, such as his Manhattan apartment, luxury event spaces, fancy restaurants, travel, and interior designers. LUCAS spent tens of thousands of investor dollars to burnish his own image and career, such through payments to political consultants, transfers to companies he owned, or support for the local newspaper he controlled. LUCAS also channeled more investor monies to Immunocologie, a luxury skincare business run by LUCAS's wife, than to any other portfolio company. LUCAS, however, arranged for LBE, not the Funds, to take a majority ownership interest in Immunocologie, thus giving LUCAS and not his clients an equity interest in the business. LUCAS's conduct left the Funds chronically undercapitalized and unable even to cover basic fund expenses, including salaries for LBE

2

employees that were supposed to paid out of LBE's management fee for the Funds, even as new investor money continued flowing in.

5.      JAY LUCAS, the defendant, used various mechanisms to enrich himself at the expense of the Funds and their investors. Most brazenly, between approximately January 2018 and October 2023, LUCAS directly transferred over $6 million of investor money from Funds One and Two into a bank account belonging to XL7 Group, LLC ("XL7"), a firm LUCAS owned and controlled with his wife. LUCAS then used the XL7 bank account as a slush fund to pay his personal expenses. LUCAS also funneled investor money to XL7 indirectly, ensuring that the money took a circuitous path to seek to obscure its true source. Sometimes LUCAS even transferred money directly to XL7 from LBE portfolio companies, including Immunocologie. LUCAS treated this money as his own—not the Funds'—and when he or his wife were short on money to cover a personal expense, they would instruct others to "put in on the XL7 card." At times, LUCAS also paid for his personal expenses directly out of the Funds' bank accounts without first going through XL7. All this spending enriched LUCAS while diverting much-needed money away from the management of the Funds and the portfolio companies, directly harming the Funds and making it unlikely that his investors would ever see their investments pay off.

6.      JAY LUCAS, the defendant, also perpetuated his fraudulent scheme by using money from new investors to pay earlier investors, in Ponzi-like fashion. Prior to founding LBE and the Funds, LUCAS had raised investor money for a fund called Lucas Group Capital LP ("Fund Zero"). By 2017, some of Fund Zero's investments had realized positive returns and were making distributions into Fund Zero's bank account. But instead of distributing that money to Fund Zero's investors, LUCAS transferred the money to XL7 and used it for himself. As pressure mounted to pay the Fund Zero investors, LUCAS took money from Fund Two investors and used it to pay Fund Zero investors. At other times, LUCAS transferred money from Fund Two to pay

3

Fund One. More broadly, instead of safeguarding investors' money, LUCAS transferred money freely between the Funds' accounts, the LBE account, other corporate accounts, and his personal accounts, including the XL7 account—sometimes with multiple transfers back and forth between the same accounts in a single day—in circuitous transactions designed to seek to obscure the source of the payments. In September 2024, after LUCAS received approximately $125,000 in new investments for Fund Three, he immediately transferred much of the money to various corporate accounts, including an account for Flags of Valor, a business he owned, and paid overdue bills unrelated to Fund Three. After directing the transfers, he asked his outside accountant, "How much [is] left in the cookie jars?" to which the accountant replied, "Lol…not much."

7.      As a single example of the misappropriation of investor funds by JAY LUCAS, the defendant: In approximately October 2022, Fund Two's bank account was overdrawn, and LBE employees were discussing the fact they "have no money at all" and "are behind on a ton of outstanding stuff." Around the same time, an investor agreed to invest $675,000 in Fund Two, which the employees said should be used on several "mission critical" items but that "Jay will blow through that check from [the investor] since he has a ton of other person[al] BS that needs to get paid (eg: 2 months of . . . rent)." When the check did come in, LUCAS transferred over half of the $675,000 to the XL7 account and from there spent the money on family members, personal rent, alimony, political donations, political consultants, shopping, and Flags of Valor. Approximately one-third of the remaining money was transferred to Immunocologie. Then, in early November 2022, after LUCAS had spent all the money transferred into XL7, he transferred money from Immunocologie to XL7 to cover another personal rent payment. By early November 2022, Fund Two's bank account was once again negative.

8.      LBE employees at times confronted JAY LUCAS, the defendant, about his misuse of investor funds but LUCAS dismissed their complaints. Internally, employees continued to

express frustration about LUCAS's misuse of investor money, writing that LUCAS's spending was "not spending on LBE," was "literally fraudulent," and was "a huge betrayal of investor trust and most likely illegal." But after confronting LUCAS on the spending on multiple occasions, LBE employees feared that pressing him any further would cost them their jobs. LUCAS, meanwhile, took steps to further conceal his fraud. In late 2018, without telling investors, LUCAS ended the relationship with the third-party fund administrator that he had said was overseeing the Funds' compliance—even as he continued to tell prospective investors that this third-party administrator was still working for LBE. And LUCAS never hired an outside auditor to provide audited financials to investors, even though the operating agreements for the Funds committed him to doing so.

9.      The Funds' disclosure documents provided that, in exchange for managing the Funds, LBE (and thus JAY LUCAS, the defendant, as its owner) was entitled to a management fee "not to exceed one and a half percent (1.5%) per annum," plus an additional, larger payment in the event the investments paid off and resulted in a liquidation event. Because the 1.5% management fee was tied to the value of the Funds' investments, LUCAS had an incentive to maintain high valuations for the portfolio companies, and he repeatedly failed to write down failing investments in order to justify a higher fee for himself. LBE issued quarterly reports that purported to provide the quarterly management fee payments and expenses. But the reported fees were millions of dollars less than the true amounts that LUCAS had paid himself by transferring investor funds to his personal accounts and paying for his personal expenses.

10.     The quarterly disclosures also included—without explanation—a running total of Fund assets described as "Due from Affiliates." The "Due from Affiliates" total for Fund Two at one point reached almost $10 million. Skeptical investors pressed JAY LUCAS, the defendant, for more information about what this supposed "asset" was and why it was not being invested in the

portfolio companies. LUCAS evaded the question but eventually told some investors that "Due from Affiliates" represented money used to pay expenses that were in excess of the 1.5 percent management fee, including the costs of "staff" to do "all of the heavy lifting around helping the portfolio companies to grow." LUCAS explained that if the investments succeeded and the Funds eventually had a liquidation event, then LBE would "repay" these expenses to the Funds, and the amount was thus "due" to the Fund. This explanation was knowingly false. The Funds' transfers to XL7 were not for "staff"; they were spent almost entirely by LUCAS on himself. The funds were not used to cover the cost of helping the portfolio companies grow, but to cover LUCAS's personal lifestyle and unrelated business expenses. At best, the "Due from Affiliates" totals represented no-interest, uncollateralized loans of millions of dollars to LUCAS, with no documentation memorializing the terms of the loan, no assurance that LUCAS would have the funds to repay the loan, and no assurance that the loan would ever be paid off in the absence of a liquidation event large enough to cover the debt.

11.     JAY LUCAS, the defendant, also deceived investors and misappropriated investor funds by investing millions of dollars in Immunocologie, which money was then used largely to fund the lifestyle of LUCAS's wife. Approximately 40% of the funds that were actually sent to LBE portfolio companies (and not diverted directly to LUCAS himself) were sent to Immunocologie, even though Immunocologie never turned a profit and had limited revenue. Most of the purported investment in Immunocologie went to "marketing" expenses, such as parties and trips to luxury resorts where LUCAS's wife promoted "brand awareness." Investors were unaware that LUCAS was using their money to fund his wife's social calendar, and many investors did not even know that the person operating Immunocologie was married to LUCAS.

12.     JAY LUCAS, the defendant, also lied to investors about the nature of the Funds' investments in Immunocologie. At least by 2017, LUCAS issued quarterly reports for Fund One

6

stating that Fund One—which by that point had invested over $4 million in Immunocologie, more than a third of the money Fund One had raised to date—had a 51% equity interest in Immunocologie. That was knowingly false. None of the Funds ever had an equity interest in Immunocologie. Instead, at all relevant times, it was LBE—and therefore LUCAS himself—who owned the 51% equity interest in Immunocologie, not the Funds. Fund One had invested millions in Immunocologie and received no ownership interest whatsoever in return for its investment, all to LUCAS's advantage, and in breach of the fiduciary duties LUCAS owed to the Funds and investors.

13.     JAY LUCAS, the defendant, compounded the lie about Immunocologie's ownership when he founded Fund Two and told investors that Fund Two had also invested in Immunocologie. As with Fund One, Fund Two received no equity in exchange for the millions of dollars it sent to Immunocologie. But Fund Two's quarterly disclosures continued to report on the percentage of Immunocologie owned by Fund Two. For some quarters, the combined purported Immunocologie ownership of Fund One and Fund Two even exceeded 100%.

14.     It was not until approximately 2019 that JAY LUCAS, the defendant, finally memorialized the Funds' investment in Immunocologie, but he did so not by issuing equity to the Funds, but by executing promissory notes. These promissory notes gave the Funds a debt interest in Immunocologie, not an equity interest. But LBE's quarterly disclosures continued to falsely describe the Funds' interests in Immunocologie as equity interests—suggesting that the Funds would be able to participate in any anticipated upside—when they were actually debt interests, meaning that their potential recovery was capped. It was LUCAS, meanwhile, who continued to hold the majority interest in Immunocologie, and who stood to gain if the company ever succeeded. When LBE employees tried to change the quarterly reports to accurately reflect that the Funds'

interest was a debt interest and not an equity interest, LUCAS directed them to change the disclosures back.

15.    As of the date of this Indictment, none of the Funds' investments has paid off, and no investors have received returns. The Funds and their portfolio companies have hemorrhaged cash and been unable to cover basic expenses while JAY LUCAS, the defendant, and his family have taken the Funds' money to serve their own interests.

Statutory Allegations

16.    Between at least in or about 2017 and the present, in the Southern District of New York and elsewhere, JAY LUCAS, the defendant, willfully and knowingly, directly and indirectly, by the use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, LUCAS made material misrepresentations to the Funds' existing and potential investors regarding the nature, value, and condition of the Funds' investments and misappropriated investor funds for his own use.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

## COUNT TWO
### (Investment Adviser Fraud)

The Grand Jury further charges:

17.     The allegations contained in paragraphs 1 through 15 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

18.     From at least in or about 2017 through the present, in the Southern District of New York and elsewhere, JAY LUCAS, the defendant, willfully and knowingly, while acting as an investment advisor, by use of the mails and a means and instrumentality of interstate commerce, directly and indirectly, (a) employed a device, scheme, and artifice to defraud a client and prospective client; (b) engaged in a transaction, practice, and course of business which operated as a fraud and deceit upon a client and prospective client; and (c) engaged in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, LUCAS, while acting as an investment adviser to the Funds and their existing and potential investors, made false and misleading representations and omitted to state material facts about the nature, value, and condition of the Funds' investments, his personal financial interests in the Funds' business activities, and his use and misappropriation of investor funds.

(Title 15, United States Code, Sections 80b-6 and 80b-17;
Title 18, United States Code, Section 2.)

## COUNT THREE
### (Wire Fraud)

The Grand Jury further charges:

19.     The allegations contained in paragraphs 1 through 15 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

20.     Between in or about 2017 and the present, in the Southern District of New York and elsewhere, JAY LUCAS, the defendant, knowingly having devised and intending to devise a

scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, LUCAS, through the use of interstate wire communications, including investor solicitations communicated to prospective investors located in the Southern District of New York and elsewhere, made material misrepresentations about the nature, value, and condition of the Funds' investments and misappropriated investor funds for his own use.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FOUR
### (Money Laundering)

The Grand Jury further charges:

21.     The allegations contained in paragraphs 1 through 15 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

22.     Between in or about 2017 and the present, in the Southern District of New York and elsewhere, JAY LUCAS, the defendant, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5, and wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transaction was designed

in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity.

(Title 18, United States Code, Section 1956(a)(1)(B)(i) and 2.)

## FORFEITURE ALLEGATION

23.    As a result of committing the offense alleged in Counts One, Two, and Three of this Indictment, JAY LUCAS, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

24.    As a result of committing the offense alleged in Count Four of this Indictment, JAY LUCAS, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

## SUBSTITUTE ASSETS PROVISION

25.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of JAY LUCAS, the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be

subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United

States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of

any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981 and 982; Title 21, United States Code, Section 853;
and Title 28, United States Code, Section 2461.)

_____
Grand Jury Foreperson

_____
JAY CLAYTON
United States Attorney

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the

Southern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| JAY LUCAS | ) | Case No. |
| | ) | |
| | ) | |
| | ) | 25 CRIM 581 |
| | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     JAY LUCAS                                                      ,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☐ Complaint

☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

15 USC 78j(b) & 78ff - Securiites Fraud
15 USC 80b-6 & 80b-17 - Investment Adviser Fraud
18 USC 1343 - Wire Fraud
18 USC 1956(a)(1)(B)(i) & 2 - Money Laundering

Date:     12/16/2025

_____
*Issuing officer's signature*

**Tammi M. Hellwig**
_____
*Printed name and title*

City and state:     New York, New York

---

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____                      _____<br>*Arresting officer's signature* |
| _____<br>*Printed name and title* |